**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

VIRGINIA MARIE JONES,        )
           )
        Plaintiff,       )
           )
vs.               )     Case No. 10-cv-631-TLW
           )
MICHAEL J. ASTRUE,        )
Commissioner of the Social Security    )
Administration,          )
           )
        Defendant.     )

## OPINION AND ORDER

Plaintiff Virginia Marie Jones, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying her applications for disability benefits under Titles II and XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 8). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

## Background

Plaintiff was born December 7, 1967, and was 42 years old at the time of the Administrative Law Judge's ("ALJ") decision. (R. 39, 185). She is a widow with no children under age eighteen. (R. 186, 238). She did not graduate high school, only completing the ninth grade, and did not complete her GED. (R. 40). In 1980, she began working for various nursing homes, where she received training as a nurses' aide. She was employed by nursing homes for approximately twenty years. Id. She last worked in 2005, cleaning private homes. (R. 36-39, 51).

**Hearing Summary**

A hearing was held March 31, 2010, in front of ALJ Deborah L. Rose. During her opening argument, plaintiff's attorney made clear that plaintiff's case is about her physical disability and requested a consultative examination for her physical problems, stating:

> Your Honor, my client does not meet or equal listing 1.04, and this is a step five case. She has impairments of her back and neck, and she also suffers from migraines, and all of this started with a car accident in January of 2006, and she will testify that it has gotten worse since then. I'd also mention, Your Honor, that I don't believe that there have been any consultative exams done, and we would request a consultative exam.

(R. 35).

Plaintiff's testified that her former work was as a nurse's aide and a cook at several different elderly living centers. (R. 36-38). She said that she became disabled after a car accident in January, 2006.[1] Plaintiff testified that she cannot work due to her lower back, her neck, and migraines which at times render her bedfast for "a couple of days." (R. 42). She said that prior to her most recent accident, plaintiff drove herself to the store. (R. 43).

She claims to be able to sit for approximately twenty minutes, if she is able to "wiggle around." Id. After twenty minutes, pain in her lower back forces her to "get up and pace" for about ten minutes to relieve the pain before she can sit again. (R. 44). She claims to alternate between sitting and pacing "all day and all night." Id. She said that she paces "real slow," although she admits that she has no trouble walking. Id.

Plaintiff said that she is able to stand in one place for 10 to 15 minutes, after which she experiences lower back and neck pain. She stated that she would not be able to sit at a desk and look down due to her neck pain. (R. 44-45). Plaintiff admitted that her migraines are improving.

---

[1] Plaintiff stated she was involved in a second accident which occurred September 12, 2009, after her insured status expired. Plaintiff's attorney focused her questioning on plaintiff's condition prior to this most recent accident.

(R. 45).  She explained that after her recent auto accident, she was given Morphine, "which is keeping the migraines from coming back. … I'm not getting migraines, and I'm not as stressed out as what I used to be."  (R. 46).  Plaintiff testified that her medication caused her to be sleepy and dizzy at least four times a day.[2]

Plaintiff's most comfortable position is "pacing."  She said, "When I'm up pacing, and as much as I can tolerate it, I don't seem to be in as much pain as what sitting puts you in, and laying puts you in.  But I can't pace for very long either because being on my feet too much hurts too.  I'm not really comfortable in any position for very long."  (R. 47-48).  She cannot bend or lift a milk jug, claiming a sharp pain in her back when she tries.  (R. 48).  She does not sleep well, having to rise every night to pace after "sharp pains" wake her.  Id.  She claimed she has not slept eight hours straight in two years.  (R. 49).

Plaintiff described taking a hot bath and using a TENS unit to help ease her pain.  Id.  She does not socialize or attend church.  She shops for groceries once a month with her mother.  She claims to stay home six days out of the week (mostly staying in her nightgown), going out only one day a week.  Id.  Plaintiff said her parents do all the housework, including her laundry, and they help bathe her because she is unable to get into and out of the tub alone.  (R. 50).  Before her most 2009 auto accident, she said she was able to sweep.

Plaintiff testified that there are no additional impairments she has trouble with which she believes would be important to tell the ALJ.  (R. 50).

The ALJ briefly questioned plaintiff about obtaining her GED before turning to the Vocational Expert ("VE") for testimony.  Plaintiff stated that she "never said [she] was going to

---

[2]  Plaintiff did not specify which medicine causes these side effects.

school. [She] said [she] wanted to go to school and get [her] GED, but [she] never had the opportunity to do that," claiming she was unable to afford it. (R. 51).

Plaintiff's attorney had no objection to the VE testifying as an expert. The "regional economy" was identified by the VE as Oklahoma and the United States. (R. 52). Plaintiff's prior work as a certified nursing assistant ("CNA") was identified as medium strength according to the DOT, with SVP of 4-semi-skilled. The VE clarified that plaintiff indicated she performed this work at a heavy level. Her work as a cook at the nursing home was determined to be medium strength with SVP of 6-skilled. Plaintiff's housekeeping was classified as medium strength with SVP of 2-entry level. Id.

Next, the ALJ presented the following hypothetical question to the VE:

Assuming an individual who is 42 years of age with a limited ninth grade education, and the past relevant work history you have just described. If that individual were limited to lifting and carrying up to 10 pounds frequently and 20 pounds occasionally. Standing and walking six hours a day, and sitting six hours a day, and pushing and pulling would be limited only to the 10 and 20 pound limits. If this individual would also need to avoid concentrated exposure to hazards, and could only occasionally climb, balance, stoop, kneel, crouch, and crawl but could never climb ladders, ropes, or scaffolds, and if this individual could only occasionally perform overhead reaching, would they -- would this individual be able to perform any of the claimant's past relevant work?

(R. 53). The VE testified such an individual would not be able to perform any of plaintiff's past relevant work, and went on to identify the vocations of mail clerk (400 jobs in Oklahoma, 48,000 in the nation), unskilled cashier jobs such as cafeteria cashier or self-service gas (400 jobs in Oklahoma, 48,000 in the nation), office helper or messenger (900 in Oklahoma, 112,000 in the nation), and various unskilled sorting jobs (450 in Oklahoma, 50,000 in the nation), all in the light range. Id. In the unskilled sedentary range, the VE identified the jobs of food order clerk (350 in Oklahoma, 40,000 in the nation), charge account clerks (300 in Oklahoma, 28,000 in the nation), and inspecting/checker jobs (250 in Oklahoma, 20,000 in the nation). (R. 53-54).

The ALJ then presented a modified hypothetical limiting the individual to sedentary work as defined by the regulations, with all the previous limitations from the first hypothetical, adding that the person would need to alternate between sitting and standing every ten minutes, lie down for an hour twice daily, and be absent from work at least two or more times a month consistently. The VE stated such an individual would not be able to work in a competitive market. (R. 54).

Plaintiff's attorney then presented a hypothetical matching the first one presented by the ALJ, except she changed the reaching overhead limitation to occasional reaching in all directions, including overhead. The VE stated that the new limitation would eliminate the jobs previously described, but such an individual could perform the sedentary job of semi-conductor loader bonder (250 in Oklahoma, 25,000 in the nation), and the light jobs of bakery worker (300 in Oklahoma, 26,000 in the nation), and rental consultant (200 in Oklahoma, 23,000 in the nation). (R. 55-56).

## Non-Medical Records

In a Disability Report - Adult form dated May 8, 2007, plaintiff noted the conditions limiting her ability to work to be "lower back and neck injury/migranes [sic]." (R. 216). She claimed her conditions made her unable to lift anything; unable to stand or sit for a period of time; unable to "be around light" when she has a headache; and, unable to sleep more than two to three hours a night. Id. She also claimed that her condition caused "a lot of pain" in her back. Id. She listed her medications as carisoprodol (a muscle relaxant), Oxycodone (an opioid pain reliever) for pain, and Trazodone (an antidepressant used to treat depression, anxiety, and chronic pain) "to sleep." (R. 222). Plaintiff noted that she completed ninth grade, with no special job training. (R. 223).[3] She listed her former employment as a CNA from 1980 to 2001,

_____

[3] Plaintiff testified she received on the job CNA training. (R. 40).

a cook from 1984 to 2004, and a "private home cleaner" from April, 2005 to October, 2005.  (R. 225).

In a Disability Report - Appeal form, plaintiff again listed her medications as carisoprodol (muscle relaxant) to "help[] control spasms," Oxycodone (opioid pain reliever) to "help[] with the pain [she] experiences from [her] conditions," and Trazodone to "help[] to relieve [her] depression."  (R. 248).[4]  A medication form dated June 8, 2009, shows plaintiff reported taking soma (muscle relaxer), Trazodone ("for difficulty sleeping"), Percocet (pain reliever), and promethazine (nausea medication), all prescribed by "Dr. Henson."  (R. 278).  On December 23, 2009, plaintiff reported prescriptions of Flexeril (muscle relaxer), Trazodone ("for difficulty sleeping"), Percocet and Oxycodone (pain relievers), from "Dr. Nebergall."  (R. 286). A final medication list dated March 31, 2010 shows plaintiff taking Morphine (from "Dr. Ree"), promethazine (for nausea, from "Dr. Henson"), ranitidine (for heartburn), and Advil (ibuprophen pain reliever).  (R. 288).

**Medical Records**

**Treating Physicians**

Plaintiff visited the Omni Medical Group nine times between December 18, 2001 and May 3, 2010.  (R. 549-570).  During her first visit on December 18, 2001, plaintiff's chief complaint was low back pain.  She explained that she had cared for her husband, a cancer patient, at home, frequently needing to lift him, which caused her to develop low back pain.  He

---

[4] The undersigned cannot find a diagnosis of depression in plaintiff's medical records. Trazodone was prescribed by Carol Krause, M.D. because plaintiff complained of trouble sleeping and pain at night.  (R. 296).  There is a note in Dr. Krause's file that she was replacing plaintiff's Flexeril (a muscle relaxant) with Trazodone.  (R. 302).  There is a note in records from Omni Medical Group dated December 18, 2001, that mentions plaintiff "is having some depression," but the note is not signed by any physician, only "signed by administrator."  (R. 550).  Plaintiff reported to other physicians she did not suffer from depression, anxiety, or suicidal ideations.  (R. 475, 557).

had passed away in November, 2001. She reported a prior injury to her back for which she received physical therapy. Plaintiff was noted to be in grief, "having some depression," with several financial concerns. (R. 550). Straight leg testing was negative; however, plaintiff displayed decreased range of motion with discomfort and decreased extension and flexion, and discomfort with side bending. She was diagnosed with acute lumbar strain and grief, and prescribed Lortab for pain. Id. Plaintiff underwent a CT scan of her brain on April 11, 2002. Overall, the result was within normal limits with a note of a small area of contusion in the left frontal region. (R. 551).

Plaintiff presented to Halifax Medical Center's emergency department January 10, 2006 after a motor vehicle accident, complaining of pain in the back of her head, neck and low back pain. Cervical and lumbar spine x-rays were taken, which were negative for evidence of fractures or subluxation (spinal bones out of alignment). She was given Lortab for neck and low back pain, told to use moist heat on her back and neck, and directed to follow up with her primary care doctor. (R. 452-453).

Plaintiff presented to Halifax Medical Center's emergency room again January 14, 2006 complaining of continued neck pain. She denied any mid or low back pain. (R. 458). Examination revealed "minimal pain on palpation of the cervical spine," and limited range of motion in her neck "due to pain." No pain was noted with palpation of the thoracic or lumbar spine. Minimal pain was found on palpation of the right clavicular area. She was diagnosed with cervical strain post motor vehicle accident, given a prescription for Flexeril (muscle relaxer), and Tylenol 3 for pain. She was told to use moist heat on the area of pain, return to the ER if the pain worsened, and keep her appointment with her primary doctor the following Monday. (R. 459).

Plaintiff visited Florida Medical Associates January 16, 2006. She received a range of motion test with a MES 9000 Motion Analyzer (computerized dual dynamic inclinometer system) by her chiropractor, Harry Vassilakis, D.C. (R. 380-384, 445-448). Plaintiff's cervical and thoracic spine were tested. For her cervical spine, flexion and extension were found to be 19 degrees (normal range 50 degrees), right lateral bending was 31 degrees (normal range 45 degrees), left lateral bending was 36 degrees (normal 45 degrees), right rotation 28 degrees (normal 80 degrees), and left rotation was 27 degrees (normal 80 degrees). Plaintiff's thoracic spine testing found right rotation to be 25 degrees (normal 30 degrees), left rotation 4 degrees (normal 30 degrees), and flexion was 27 degrees (normal 50 degrees). (R. 382). Dr. Vassilakis' impressions after examination were cervical/thoracic sprain/strain, secondary to a motor vehicle collision; posttraumatic headaches, secondary to the collision; intervertebral fixations of the upper cervical spine, secondary to the collision; and "right anterior chest pain/major minor sprain/strain as well as right shoulder sprain/strain secondary to a motor vehicle collision occurring on January 10, 2006." (R. 447). He recommended physical therapy and rehabilitation exercises, a headache pillow and gel pack, a referral to a neurologist, and work restriction for two weeks or until re-evaluation. (R. 448).

On January 20, 2006, plaintiff presented to Frank S. Alvarez, Jr., M.D. for a neurological examination. (R. 354-361). Dr. Alvarez recounted plaintiff's headache complaints and medical history. Upon examination, he found limited range of motion in her right shoulder and right chest, tenderness in the right side of her neck and the left occipital area, decreased cervical range of motion with pain particularly on the right side, decreased thoracic range of motion producing lower back pain, markedly limited lumbar range of motion producing lower back pain "with a list and right paravertebral prominence." (R. 356). She was assessed with a concussion,

posttraumatic headaches, a possible right rotator cuff tear, contusions, and exacerbation of pre-existing lumbosacral pain. Dr. Alvarez's treatment plan included the headache pillow and gel pack prescribed by Dr. Vassilakis, heat applications multiple times a day, physical therapy, an MRI scan of her shoulder, limited activity, especially with her right arm, activity (walking or swimming) without excessive use of her right arm, and prescriptions for Lortab and Zanaflex. (R. 357-358).

On February 1, 2006, x-rays were taken of plaintiff's cervical spine. No acute abnormality was noted. (R. 373-374). Nonethelesss, subjective complaints to Dr. Alvarez on February 3, 2006, show plaintiff complained of worsening neck and lower back pain over the previous ten days. In a review of plaintiff's records, Dr. Alvarez noted a CAT scan dated March 27, 2004, which showed "broad-based disk bulge at L4-L5 and L5-S1. There were no disk herniations noted." (R. 352). He also noted MRI results showed no tears to her shoulder, and the scan of her brain was unremarkable. Dr. Alvarez's plan included an MRI of plaintiff's lumbar spine, using her right shoulder more, Percocet for pain and Zanaflex as a muscle relaxer, trigger point injections, and discontinuation of physical therapy as plaintiff felt her symptoms were increasing with it. (R. 353).

Plaintiff visited Carol L. Krause, M.D., a pain management specialist, on February 21, 2006. Dr. Krause's impressions were somatic dysfunctions in her ribcage with no fractures, myofascial tightness and somatic dysfunctions in her neck, shoulder blade, pelvis, and the sacroiliac joint, which could be contributing to her worsening lower back pain since her accident. Dr. Krause instructed plaintiff in gentle self-mobilization exercises, aimed at her areas of pain, which improved plaintiff's mobility and pain; introduced plaintiff to "mind-body techniques" to

help her anxiety while driving; recommended <u>The Busy Person's Guide to Easier Movement</u> for more self-mobilizing exercises; and told her to continue her medications. (R. 350).

On March 10, 2006, plaintiff returned to Dr. Alvarez for a neurological re-evaluation. (R. 344-346). He noted plaintiff's range of motion and the pain produced in her right chest with movement of her right shoulder, tenderness in her right neck, trapezius and suprascapular area, and limited cervical and lumbar range of motion. (R. 345). Dr. Alvarez noted MRI results dated February 22, 2006, showed "bulging disks with arthropathy at both L3-L4 and L4-S1. At L5-S1 there is facet arthropathy. There is narrowing of the neural foramina at these levels." <u>Id.</u> Plaintiff was advised to continue her medications (Percocet and Zanaflex), follow up with Dr. Krause, and continue physical therapy; she was also introduced to a TENS unit for home use. Dr. Alvarez recommended another MRI of plaintiff's cervical spine to rule out a structural lesion, and gave her more trigger-point injections. (R. 346).

Plaintiff visited Dr. Krause again March 16, 2006 for a follow up. (R. 342-343). Plaintiff reported her headaches and neck pain had improved, but her low back pain was constant. (R. 342). Dr. Krause's impressions were anterior chest wall tenderness; neck pain and headaches, which had improved with massage therapy; and low back pain. Her plan for plaintiff included continuing the mind-body techniques to decrease plaintiff's level of pain; continuing plaintiff's exercises; temporarily discontinuing part of the massage therapy and electrical stimulation; continuing plaintiff's medications as needed; and continuing use of the TENS unit at home. (R. 343).

Plaintiff returned to Dr. Alvarez March 29, 2006. (R. 339-341). Her headaches, neck and low back pain reportedly were in the 6-8 out of 10, on a pain scale of 1 to 10 range (10 being the greatest amount of pain). Dr. Alvarez's plan included a cervical MRI scan, continuing

Percocet for pain, adding Elavil for bedtime pain, and additional trigger-point injections, which she said greatly improved her back pain. (R. 340-341). Dr. Alvarez opined that plaintiff "can continue at light-duty activities not lifting over 15 pounds, no excessive pushing, pulling, bending, squatting, twisting, or turning though I have suggested perhaps she could try increasing this by five to ten pounds a month gradually until she is hopefully back to normal eventually." (R. 341).

Dr. Krause saw plaintiff next on April 13, 2006. (R. 337-338). Her complaints of low back and neck pain, as well as headaches consistently remained at 7-8 out of 10. Dr. Krause's plan included switching plaintiff to Soma (a muscle relaxant) from Elavil due to the side effect of severe heartburn, further instruction on use of the mind-body technique, continuing her exercises, and continued use of Percocet for pain. (R. 338). Dr. Krause also noted plaintiff received a cervical MRI scan April 13, 2006. The radiologist's impression was "[u]nremarkable MRI of the cervical spine. No disc protrusions or stenosis identified." (R. 370).

Plaintiff returned to Dr. Alvarez on April 28, 2006, for a follow up visit. (R. 334-336). Plaintiff reported she had not had any headaches in the previous month utilizing Dr. Krause's pain control techniques, her neck pain had decreased from 7-8 out of 10 to 3-4 out of 10, occurring "a couple of times a week for 15 to 20 minutes with stiffness," and low back pain from 8-9 out of 10 on the pain scale. (R. 334). Dr. Alvarez noted plaintiff was not working and was limiting her household and leisure activities. (R. 334-335). He mentioned the April 13, 2006 MRI as being unremarkable. Dr. Alvarez administered trigger-point injections, recommended plaintiff continue treatment with Dr. Krause, switched her to Lortab (pain medication) from Percocet, and noted she "could increase her level of activity not lifting over 30 pounds and no excessive pushing, pulling, bending, squatting, twisting, turning, or climbing." (R. 336).

Plaintiff again saw Dr. Alvarez on May 11, 2006, for a follow up. (R. 332-333). Plaintiff reported severe headaches, increased neck pain (8 out of 10), and continued severe low back pain. (R. 332). Dr. Alvarez gave plaintiff trigger-point injections, recommended she continue her current medications, and that she increase her activity to not lifting over 25 pounds. (R. 333).

On May 16, 2006, plaintiff returned to Dr. Krause. (R. 330-331). She told Dr. Krause she only had one headache in the previous month, that her neck pain "comes and goes," that her neck pain had increased to a 6 of 10, that her chest wall and low back pain were both a constant 8 of 10, and that the trigger-point injections from Dr. Alvarez were helping. (R. 330). Plaintiff reported Percocet helped her pain more than Lortab, but she was unable to afford it. She said Soma initially made her drowsy, but it now helps with no side effects. Dr. Krause refilled plaintiff's Percocet and Soma and offered more mind-body techniques for coping with her pain. (R. 331).

Plaintiff returned to Dr. Krause June 15, 2006. (R. 329). Her headaches had increased slightly, her neck pain reportedly had "not been bothering her," and her chest wall and low back pain remained the same as her last visit. Dr. Krause refilled her medications, worked on more mind-body pain control techniques, and reiterated the work restrictions from Dr. Alvarez. Id. Plaintiff returned to Dr. Alvarez June 29, 2006 (R. 326-328), complaining of headaches (7 of 10 on the pain scale) occurring three times a week, upper chest pain, and low back pain. Plaintiff stated her neck pain was gone after the trigger-point injections "with no further symptoms there at all." (R. 326). Dr. Alvarez recommended plaintiff continue her medications (Soma and Percocet) and continue Dr. Krause's treatment. He administered trigger-point injections and suggested plaintiff try Cymbalta (anti-depressant that also helps pain and sleeplessness) at

bedtime. He recommended plaintiff could continue "at light-duty activity not lifting over 25 pounds and no excessive bending, sitting, squatting, or climbing." (R. 328).

Plaintiff was seen by Dr. Krause July 18, 2006 (R. 324-325), stating her headaches were occurring once every two weeks, that her neck "hardly bothers her at all," that she had some upper chest pain, and severe low back pain, with pain radiating into her right buttock. She fell twice in the previous week, stating her right leg "gave out," and felt like it went to sleep. Plaintiff reported no changes with the Cymbalta prescribed by Dr. Alvarez, and she continued to take the Percocet and Soma. (R. 324). Dr. Krause offered plaintiff an EMG and nerve conduction to evaluate the problem with her right leg, but plaintiff stated she preferred to "hold off" on the EMG. (R. 325). Dr. Krause gave plaintiff more exercises, more mind-body techniques, and refilled her medication.

Plaintiff returned to Dr. Alvarez on July 31, 2006 (R. 322-323), complaining of headaches (6 of 10 on the pain scale) twice a week; some neck pain which was aggravated by moving her neck, sitting longer than 30 minutes, or using her arms; and severe low back pain, which she stated was helped by the trigger-point injections, the TENS unit, medication, and rest. (R. 322). Dr. Alvarez noted plaintiff said she was "starting a new job doing paperwork" that week, and was limiting her activities at home "as far as vacuuming." Id. He ordered a repeat MRI scan of her lumbar spine, an EMG study of her right leg, gave her more trigger-point injections, and told her to continue the Soma and Percocet. He advised she stop the Cymbalta since it did not help and told her she could continue light-duty activities. (R. 323).

Dr. Krause examined plaintiff again on August 3, 2006. (R. 320-321). Plaintiff complained of increased headaches, chest wall pain, and low back pain. Plaintiff reported she was to begin a full time "office work" job with hours of 8:00 a.m. to 4:00 p.m. She was anxious

about this because she had never performed such work before. Dr. Krause noted plaintiff had an MRI (dated July 31, 2006) of her spine which showed no changes from prior scans. (R. 320). Dr. Krause recommended plaintiff take half a Percocet during the day while working and the Soma three to four times a day. She gave her a prescription for Ambien to help her sleep, discussed proper ergonomics at work and coping mechanisms for pain and stress. (R. 321).

Plaintiff returned to Dr. Krause on August 17, 2006 (R. 318-319), complaining of severe headaches occurring daily, and severe low back pain. Dr. Krause refilled plaintiff's medications and discussed coping mechanisms and exercises. (R. 318).

On August 30, 2006, plaintiff returned to Dr. Alvarez. (R. 315-317). She complained of severe headaches three times a week, neck pain, and low back pain. She reported taking Percocet, Soma, and Ambien. She reported she was not working and limited her activities at home. (R. 315). Dr. Alvarez discussed plaintiff's February 22, 2006 MRI results, noting a disc bulge "with mild foraminal narrowing toward the left" at L5-S1. Plaintiff received trigger-point injections, direction to continue her medications, and a referral back to the chiropractor. (R. 317).

Plaintiff returned to Dr. Krause on September 14, 2006 (R. 313-314), with complaints of headaches (which had improved), chest wall pain, and low back pain. Plaintiff reported her neck was not bothering her. (R. 313). She reported taking Percocet, Soma, and Ambien, all with no problems. Plaintiff was given instructions for more exercises to help her lumbar spine and was encouraged to continue working on all her exercises and mind-body techniques. In addition, pain coping mechanisms were discussed, and Dr. Krause refilled her prescriptions. (R. 314).

On September 25, 2006, plaintiff presented to Halifax Medical Center's Emergency-Express Care center. (R. 463-467). Her chief complaint was neck pain, stating she had spent the

previous day at Sea World, beginning at 7:00 a.m., "riding on various roller coasters and rides until about noon when she started to develop neck and back pain." (R. 464). Plaintiff told emergency staff she had no preexisting condition, just persistent neck and back pain. She claimed "there was no injury, she was simply riding on roller coasters." She had been ambulatory; she denied headaches, chest or abdominal pain. Id. Upon examination, plaintiff showed mild tenderness in her lumbar spine on the right with no pain on straight leg raise testing with either leg. Id. An x-ray was taken, "no acute pathology identified." (R. 465). She was discharged with Darvocet-N 100, and told to follow up with an orthopedist.[5] Id.

On October 12, 2006, plaintiff returned to Dr. Krause for a follow up visit. (R. 311-312). Plaintiff complained of headaches occurring twice a week (stating chiropractic treatment helped), and chest wall and low back pain. She stated overall, her neck was "doing better." (R. 311). Dr. Krause introduced more self-mobilization exercises for her ribcage; she discussed ergonomic ways to make her cleaning chores less stressful on her back; she refilled and adjusted her medications; she made no changes to plaintiff's work restrictions; and, she noted her EMG study came back normal. (R. 312).

Plaintiff returned to Dr. Alvarez on October 16, 2006 for what Dr. Alvarez noted was her final visit to him. (R. 307-310). Dr. Alvarez titled his report "Neurological Maximum Medical Improvement." On this visit, plaintiff reported that she had one headache a week, which was a 6 out of 10 on the pain scale and lasted 30 minutes to an hour. She said chiropractic care helped. She reported her neck was "no longer bothering her," with no arm radiation, numbness, or tingling, although reaching up aggravated the area. She reported daily low back pain (7 to 8 of 10 on the pain scale), and she claimed that use of her legs, bending, twisting, turning, walking 20

---

[5] There is no record of plaintiff mentioning this incident to her treating physicians or visiting an orthopedist as recommended.

to 30 minutes, and sitting all aggravated her pain.  Dr. Alvarez noted from her history that part of her back pain was pre-existing to the automobile accident in January of 2006, and plaintiff was told she had a herniated disk at L4-L5, and required surgery, but Workers' Compensation would not allow it.  (R. 307).  Plaintiff reported taking Flexeril (muscle relaxer), Soma, and Percocet all with no problems.  Plaintiff reported that she was working cleaning houses, but limited activities such as vacuuming.  (R. 308).

In reviewing plaintiff's medical records, Dr. Alvarez noted that a CAT scan performed March 27, 2004 revealed "a broad-based disk bulge at L4-L5 and L5-S1 with no herniation or canal stenosis."  A February 22, 2006 MRI of her lumbar spine revealed posterolateral disk bulge with facet arthropathy narrowing of the neural foramina at L3-L4, loss of disk hydration with posterolateral disk bulge with facet arthropathy narrowing of the neural foramina at L4-L5 and L5-S1.  He noted plaintiff's reduced ranges of motion and recorded that her straight leg raise was 54 degrees on the right and 46 degrees on the left.  (R. 309).  Dr. Alvarez opined plaintiff had reached maximum medical improvement, recommended she continue her medications prescribed by Dr. Krause, that she continue chiropractic treatment with Dr. Vassilakis, and gave her a nine percent "whole person impairment rating" based on the AMA Guide to the Evaluation of Permanent Impairment, Fifth Edition.  He estimated her future medical costs to be between $2,000 and $2,500 per year for her medications, and stated he expected plaintiff would be "prone to further exacerbation of her symptomatology from time to time in the future…"  (R. 310).

On October 19, 2006, Dr. Vassilakis submitted a "Chiropractic Maximal Medical Improvement" report regarding plaintiff.  (R. 417-420).  He noted much the same complaints from plaintiff that Dr. Alvarez noted, with the exception of more neck pain.  (R. 417).  Dr. Vassilakis stated plaintiff missed approximately six months of working as a house cleaner but

that she has returned to that work gradually and with difficulty. (R. 418). He stated plaintiff had made "great progress for her injuries" and continued to have residual effects from the collision in January, 2006. Dr. Vassilakis opined plaintiff's medical condition had reached a point "where further recovery or deterioration [wa]s not anticipated." He stated in his opinion plaintiff had reached maximum medical improvement from a chiropractic standpoint regarding her spine and related soft tissues. (R. 420). He rated plaintiff's impairments as follows:

> According to The American Medical Association's Guides to the Evaluation of Permanent Impairment, 5th Ed., 2001… [and] utilizing the DRE method of impairment rating to the lumbar spine and AMA Guidelines, page 384, chart 1513 she has sustained a 6% impairment rating as well as a 5% impairment rating to the cervical thoracic spine utilizing the DRE method of impairment on Page 389, chart 1514 and Page 392, chart 1515. Taking into consideration the patient's chronic pain, objective findings, as well as interference of her activities of daily living as well as other factors have contributed to this current impairment rating. I will deduct 2% for a prior medical history of ongoing low back pain as well as degenerative changes giving the patient a combined whole person impairment of 9% to the related areas.

> Annual costs to the patient for ongoing chiropractic care will be in the range of $1,000.00 to $1,200.00 yearly.

Id. His recommendations for plaintiff were discontinuing active chiropractic care; continuing to work with Dr. Krause for her chronic pain; continuing to utilize rehabilitation exercises, therapeutic supplies, and support. He stated plaintiff could return to her work levels and home activity on a "per tolerance" level. Id.

Plaintiff returned to Dr. Krause on November 9, 2006. (R. 305-306). She consistently presented claims of headache pain, neck pain, chest wall pain (increased with use of her arms), and low back pain. Plaintiff stated she tried to work at housekeeping, but bending, squatting,

sweeping, and mopping all made her pain worse.[6]  She continued on Soma, Flexeril, and Percocet with no side effects.  (R. 305).  Dr. Krause recommended that plaintiff visit with vocational rehabilitation and consider getting her GED to be retrained for work other than housekeeping; she reviewed the ergonomics she had previously taught plaintiff to use in her cleaning tasks; she set plaintiff up for massage therapy; she told her to continue her medications; and she discussed coping mechanisms for pain.  (R. 306).

Plaintiff again visited Dr. Krause on December 12, 2006 with continued complaints of headaches, neck pain, and mid and low back pain.  (R. 303-304).  Plaintiff reported taking Soma, Flexeril, and Percocet, all with no problems.  Dr. Krause noted plaintiff had been "going to the library working on her GED.  She [wa]s also visiting with someone at a career vocational rehab center about trying to get her placed in some type of work that is in her restrictions."  (R. 303).  Dr. Krause's plan for plaintiff included a medication refill, setting her up for acupuncture with the chiropractor, continuing massage treatments and ultrasound, continuing use of her TENS unit, continuing work with the vocational counselor to get her GED and to find work within her restrictions, and continuing use of her coping mechanisms for pain.  (R. 304).

Plaintiff returned on January 12, 2007 to Dr. Krause (R. 301-302), stating she had been ill with an intestinal flu, which increased her headaches, neck, mid and low back pain.  She reported taking Soma and Percocet with no problems, but the Flexeril was causing her to wake in the middle of the night and she was unable to return to sleep.  Dr. Krause noted plaintiff's statement

---

[6]  It is worth reiterating at this point that despite Dr. Vassilakis report, and despite Dr. Alvarez's February, 2006 conclusion that plaintiff had reached maximum medical improvement with straight leg raises of 54% and 46%, in September, 2006, after going to Sea World and injuring herself while riding roller coasters and other rides, plaintiff told emergency staff she had no preexisting condition and that she had no headaches, chest or abdominal pain; and, the emergency staff reported that she showed only mild tenderness in her lumbar spine on the right and had no pain on straight leg raise testing with either leg.  (R. 465).

that she was continuing to work on her GED and had missed some time due to her illness, that she was looking for work, and wanting to reschedule some of the acupuncture treatments also missed due to her recent illness. (R. 301). Dr. Krause's plan for plaintiff included refilling her medications, changing the Flexeril to Trazodone "for sleep and pain," trying some "osteopathic functional indirect mobilizations myofascial release" which improved her mobility, rescheduling the acupuncture appointments, continuing to use her TENS unit, and continuing to work on her exercises. (R. 302).

On February 9, 2007, plaintiff again visited Dr. Krause. (R. 299-300). Plaintiff reported acupuncture treatments had been "very helpful," that she had not had any headaches or neck pain in the past week, and no numbness or tingling into her right leg the past three weeks. She did report chest wall and low back pain, stating the low back pain was the biggest problem. (R. 299). Plaintiff reported use of Soma and Percocet with no side effects, and use of Trazodone at bedtime without problem. She also said that she continued to work on obtaining her GED. Id. Dr. Krause refilled plaintiff's medications, discussed exploration of acupressure points with the chiropractor to help her chest wall pain, discussed coping mechanisms, and did not change plaintiff's work restrictions. (R. 300).

Plaintiff again returned to Dr. Krause on March 9, 2007. (R. 297-298). She reported use of Soma, Percocet, and Trazodone with no side effects, continued work on her GED, and headaches, neck pain, and low back pain. (R. 297). Dr. Krause refilled her medications, discussed coping mechanisms for her pain, and recommended she continue the acupuncture treatments. (R. 297-298).

On April 6, 2007, plaintiff again presented to Dr. Krause stating her headaches occur once a month, her neck pain and chest wall pain "comes and goes," and her low back pain ranged

from 5 to 10 of 10 on the pain scale, that it was constant and goes up to 10 at night and early in the morning. She continued her medications with no problems, and asked to increase the Trazodone to help her sleeplessness. She said she continued to work on her GED. (R. 295). Dr. Krause refilled her Soma and Percocet, increased the dosage of the Trazodone, discussed coping mechanisms for the pain, encouraged her regarding obtaining her GED, and recommended she continue her exercises and use of the TENS unit. (R. 296).

On May 1, 2007, plaintiff presented to the Halifax Community Health Systems' emergency department, complaining of a severe headache for the previous two days. (R. 473-476). Her systems were normal and she was discharged in stable condition with Fioricet (to relieve tension headaches). (R. 476). On May 4, 2007, plaintiff returned to Dr. Krause (R. 293-294). Plaintiff stated her neck was not a problem, but since she stopped acupuncture treatments, her headaches, chest wall pain, and low back pain had increased. (R. 293). She reported taking Soma and Percocet with no problems, and that the Trazodone was helping her sleep. Id. Dr. Krause refilled her medications, recommended she continue use of her TENS unit, exercises, and coping mechanisms for pain, and promised to have her re-evaluated by Dr. Vassilakis for acupuncture. (R. 294).

On May 27, 2007, plaintiff again presented to Halifax Community Health Systems' emergency department, with complaint of "back pain or injury." (R. 477). She reported she fell, and reported a "chronic history of falls because she gets numbness in her lower extremities." Id. She also reported she saw Dr. Krause for management of a herniated disk, that she had not seen an orthopedic surgeon, neurosurgeon, or pain management specialist, and that she had not had any MRI. Plaintiff stated her pain was in the lumbar spine (which was the site of her chronic pain), and that she had no other complaints. Id. On examination, plaintiff's extremities were

"symmetrical, [with] full range of motion, equal tone and strength." Her spine showed "hyper tenderness to palpation of the lumbar spine diffusely," straight leg testing was negative on both legs, neurologic examination, and vascular function were all normal. (R. 479). An x-ray of her lumbar spine was normal. Her diagnosis was "acute exac chronic back pain," she was given Skelaxin, and discharged home in stable condition. (R. 480). Plaintiff returned to the ER May 28, 2007, still complaining of back pain. She was given Tramadol in addition to the previous prescriptions and told to use ice and rest. (R. 484).

Plaintiff returned to Dr. Krause on June 5, 2007, stating her headaches had increased, her neck only bothered her in conjunction with the headaches, that she still has chest wall pain, and low back pain rated 5 of 10 and constant. She reported taking Percocet, Soma, and Trazodone, all with no problems. She reported no other medications. Plaintiff told Dr. Krause she was still not working, but was "going to school," had been trying to do more exercising by walking and performing TheraBand exercises received from the chiropractor. (R. 501). Dr. Krause gave plaintiff more exercises, increased her Soma due to low back muscle spasms, refilled her Percocet and Trazodone, encouraged her to utilize the pool and hot tub available to her at her residence for exercise, to continue using the TENS unit, acupuncture, and exercises, and recommended plaintiff utilize a previously recommended book to learn more exercises aimed at relaxing her back muscles. (R. 502).

On July 6, 2007, plaintiff returned to Dr. Krause (R. 499-500) with complaints of headaches, a return of her neck pain, chest wall pain, and low back pain without radiation. She reported the same medications, Soma, Trazodone, and Percocet, all working with no side effects. She was not working, but reportedly was working on her GED. (R. 499). On exam, plaintiff had "4+ to 5 out of 5 strength in both upper and lower extremities. She [wa]s able to walk on toes

and heels, c[ould] squat with help hanging on to the exam table. Her gait [wa]s slow and guarded, but otherwise okay." (R. 500). Dr. Krause answered plaintiff's questions about exercises from the recommended book, refilled her medication, and recommended she continue her other exercises and mind-body techniques. Id. On August 21, 2007, plaintiff returned to Dr. Krause. She received medication refills, and encouragement to continue working on coping mechanisms, exercises, and mind-body technique. (R. 498).

On September 21, 2007, Dr. Krause completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" for plaintiff. (R. 505-507). She stated plaintiff was limited to lifting/carrying 10 to 15 pounds occasionally, then checked 10 pounds under occasionally, and less than 10 pounds under frequently. She indicated that plaintiff could stand and/or walk less than two hours in an eight hour work day, that she could stand for 15 minutes at a time before needing to sit, and that she must periodically alternate between sitting and standing. Dr. Krause indicated that plaintiff's upper extremities were limited for pushing and/or pulling, and when asked to list the medical/clinical findings that supported her conclusions, she simply wrote "my clinical judgment - if you want more objective findings then recommend an FCE."[7] Dr. Krause limited plaintiff's balancing, kneeling, crouching, crawling, and stooping to occasional and also limited plaintiff's climbing ramps and stairs to occasional. She indicated that plaintiff must never climb a ladder, rope, or scaffold. She simply listed "see above" for the medical and/or clinical findings to support her choices. (R. 506). She limited plaintiff's manipulative functions to occasionally reaching in all directions (including overhead), and handling, fingering, and feeling were all limited to frequently, with a note saying "cannot use any away from body." Plaintiff had no visual or communicative limitations, and Dr. Krause rated her

---

[7] The undersigned cannot determine what FCE means in this context but assumes Dr. Krause is referring to a consultative exam.

environmental limitations as limited exposure to temperature extremes, noise, vibration, humidity/wetness, hazards (machinery, heights, etc.), and fumes, odors, chemicals, and gases, all with no notations of support from medical and/or clinical findings. (R. 507).

On February 18, 2008, plaintiff visited Dr. Alvarez again for a neurologic re-evaluation. (R. 518-519). Plaintiff requested more trigger-point injections. She reported taking Soma, Lortab, Trazodone, and Imitrex (for headaches), all without side effects, although she mentioned Lortab did not help her pain as much as Percocet did. (R. 518). Dr. Alvarez suggested plaintiff be referred to Stacey Burkis, M.D., instructed her to continue use of Lortab and gave her MS Contin (oral Morphine) for break through pain. He also instructed her to continue use of Soma, Trazodone, and Imitrex as needed. He administered the regular trigger-point injections. (R. 519).

Plaintiff returned to Dr. Alvarez on April 3, 2008, stating her headaches, neck, mid, and low back pain had improved. She reported receiving trigger-point injections from Dr. Burkis,[8] stating they seemed to help and that she was scheduled to return April 7, 2008. She reported her medications, said she was not working and was limiting cleaning activities at home. (R. 516). Dr. Alvarez recommended plaintiff continue her medications. (R. 517).

Plaintiff visited E.R. Henson, D.O. beginning in December, 2008. (R. 525-533). She visited Dr. Henson once a month from December 29, 2008 to June 23, 2009, with three visits in March, all for severe low back pain. Plaintiff received MRIs, x-rays, and "ongoing treatment." Her condition was initially fair with a guarded prognosis through mid-March, then Dr. Henson upgraded her prognosis to "fair." (R. 529).

---

[8] The undersigned notes no records from Dr. Burkis appear in the transcript.

Plaintiff was next seen at Summit Medical Center on September 13, 2009, after another motor vehicle accident.  (R. 534-539, 553-554).  After repair of a cut on her knee, direction to follow up with her regular doctor, and instructions to return to the emergency room if her symptoms worsened, plaintiff was discharged home.  (R. 538).  Her disposition was changed a few hours later to admitted (R. 539), and plaintiff was admitted to intensive care following an abnormal EKG test.  (R. 553).  Her injuries included generalized bruising, a cardiac bruise, a broken right arm, and a fractured right ankle.  (R. 554).  She was kept under observation, her heart was monitored, her pain was treated with Morphine, and she was told to see an orthopedic doctor to evaluate her arm.  Id.

Plaintiff presented to Omni Medical Group on September 28, 2009 with complaints of right arm pain, right ankle pain, and pain when breathing.  (R. 557-559).  Plaintiff denied anxiety, depression, or suicidal thoughts.  (R. 557).  Kevin Ree, D.O. gave plaintiff Oxycodone, Flexeril, Trazodone, and Percocet.  (R. 558).

Plaintiff was seen by R. W. Nebergall, D.O. of The Spine & Orthopedic Institute on October 22 and November 30, 2009.  Dr. Nebergall, after reviewing x-rays, found that plaintiff's right arm fracture and right ankle fracture were both in satisfactory alignment and healing well.  Dr. Nebergall gave plaintiff exercise instructions, an ankle brace, and a prescription for Lortab.  (R. 546-548).

Plaintiff saw Dr. Ree again on February 11, 2010, for a follow up visit.  (R. 564-565).  Dr. Ree noted that plaintiff was well-developed, well nourished, articulate, well groomed, and showed no apparent distress.  (R. 564).  Her medications were reviewed, and she was advised to continue all her current medications and continue with her orthopedic follow up visits.  (R. 565).  Plaintiff visited Dr. Ree again May 3, 2010, because she believed the Morphine was making her

physically ill. Dr. Ree discontinued the morphine and advised plaintiff to return as needed. He also provided plaintiff another orthopedic referral as her arm was not healing well. (R. 569).

**Agency Physicians**

Eric Puestow, M.D. completed a Physical Residual Functional Capacity ("RFC") Assessment form on July 26, 2007. (R. 489-496). The primary diagnosis was spinal strain. Dr. Puestow gave plaintiff the RFC to occasionally lift and/or carry (including upward pulling) 20 pounds, frequently lift and/or carry (including upward pulling) 10 pounds, stand and/or walk (with normal breaks), and sit (with normal breaks), each about six hours of an eight hour workday, and push and/or pull (including operation of hand and/or foot controls) was unlimited (other than as rated for lift and/or carry). (R. 490). Dr. Puestow noted plaintiff's multiple x-rays of her neck and back, which were normal, MRI scans of her right shoulder and brain, which were normal, and one MRI of her back that showed degenerative disc disease at L4-S1. He noted plaintiff was treated with Soma, Trazodone, Percocet, a TENS unit, acupuncture, and chiropractic manipulation. He noted that multiple examinations in the emergency room were normal, all of her neurological examinations were normal, and noted "neuro and physiatry exams revealed LOM [limitation of motion] of the neck and back with increased tone." He also noted plaintiff had reached maximum medical improvement on October 16, 2006 with no work restrictions. Id. Under postural limitations, Dr. Puestow said plaintiff could occasionally climb a ramp or stairs, never climb ladders, rope, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. (R. 491). He opined plaintiff was limited in "reaching all directions (including overhead)," and unlimited in handling, fingering and feeling. (R. 492). Plaintiff was given no visual or communicative limitations. (R. 492, 493). The only environmental limitation Dr. Puestow noted was "[h]azards (machinery, heights, etc.)." (R. 493). In regard to her

symptoms, Dr. Puestow noted plaintiff's "[a]llegations exceed findings.  RFC is in accord with the data."  (R. 494).

On January 11, 2008, Donald Morford, M.D. performed a second physical RFC form for plaintiff.  (R. 508-515).  The primary diagnosis was "post-traumatic neck and back pain," and the secondary diagnosis was migraine headaches.  (R. 508).  His RFC limitations matched those of Dr. Puestow.  In his explanation, Dr. Morford found that plaintiff's neuro/motor exams remained intact and that "20/10 lifting with avoidance of extremes seems feasible."  (R. 509).  He gave plaintiff the same postural, visual, communicative, and environmental limitations as Dr. Puestow, but did not impose any manipulative limitations.  (R. 511).  Dr. Morford found plaintiff's symptoms to be "credible."  (R. 513).  He noted the presence of a treating source statement regarding plaintiff's capacities in the file and noted those conclusions were not significantly different from his findings.  (R. 514).

## Decision of the Administrative Law Judge

At step one of the sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity ("SGA") since her alleged onset date of January 10, 2006.  At step two, she found that plaintiff's cervical and lumbar strains and migraine headaches were severe impairments.  (R. 15).  She found plaintiff's impairments of status post fractures of the right humerus and right ankle were each non-severe, stating limitations from these fractures would not remain severe for a period greater than twelve months.  Id.  The ALJ, at step three, found plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment, specifically focusing on section 1.04, disorders of the spine, and section 1.02, major dysfunction of a joint.  Before moving to step four, the ALJ found plaintiff retained the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with certain
> further limitations as follows:  While the claimant is able to lift/carry ten pounds

frequently and twenty pounds occasionally, stand/walk for six hours of an eight hour work day, sit for six hours of an eight hour work day, and push/pull ten pounds frequently and twenty pounds occasionally, she should only occasionally balance, stoop, kneel, crouch, crawl, or climb, never using ropes, ladders, or scaffolds. She should only occasionally reach overhead bilaterally, and she should avoid concentrated exposure to all hazards.

(R. 17). At step four, the ALJ determined plaintiff was unable to perform any of her past relevant work. (R. 23). The ALJ found plaintiff to be a younger individual with a limited education, and further found that transferability of job skills was not relevant, because use of the Grids found plaintiff "not disabled," whether or not her skills were transferrable. (R. 24). Finally, at step five, the ALJ found based on testimony from the VE, that other jobs existed in the national and regional economies which plaintiff could perform, such as mail clerk, cashier, office helper, sorter, food order clerk, charge account clerk, and inspector/checker. (R. 24-25). As a result, plaintiff was found not disabled from January 10, 2006 through the date of the ALJ's decision. (R. 25).

## Review

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the

five steps in detail).  "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary."  Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards.  Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005).  Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Id.  The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  Id.  The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands.  White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423 (d)(3).  "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms."  20 C.F.R. §§ 404.1508, 416.908.  The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians.  20 C.F.R. §§ 404.1513(a), 416.913(a).

<u>**Issues on Appeal**</u>

Plaintiff argues that the ALJ's decision should be remanded with instruction or for an award of benefits due to the following alleged errors:

1. The ALJ failed at step 5 of the sequential evaluation process;

2. The ALJ failed to properly consider the medical source evidence; and

3. The ALJ failed to perform a proper credibility determination.

(Dkt. # 12 at 2).

<u>**Discussion**</u>

**The ALJ's Step 5 Analysis**

1. Overhead Reaching Limitation and Number of Available Jobs in Oklahoma

Plaintiff first alleges that the ALJ's step 5 analysis was improper, because the VE deviated from the Dictionary of Occupational Titles ("DOT") by ignoring the fact that the DOT does not place directional limitations on reaching. Plaintiff alleges this error is harmful because when "occasional 'reaching in all directions'" was added to the hypothetical, the VE testified that plaintiff would not be able to perform the light work identified, that she could perform only one sedentary job, and that there were only 250 of these jobs in the state of Oklahoma, although there is no dispute that the VE identified two additional "light" jobs, with a total of 500 jobs in Oklahoma (making the total of available jobs 750). Plaintiff argues that in order for jobs to exist in significant numbers in Oklahoma, there must be between 650 and 900, citing <u>Allen v. Barnhart</u>, 357 F.3d 1140, 1144 (10th Cir. 2004), which cites <u>Trimiar v.Sullivan</u>, 966 F.2d 1326, 1330 (10th Cir. 1992).

The ALJ's decision to limit plaintiff's reaching to "overhead" reaching is supported by substantial evidence. The ALJ cited records from Dr. Krause showing "4+ to 5 out of 5 strength in both upper extremities and lower extremities." (R. 500). Dr. Krause's records also show that

plaintiff's reaching was only "occasionally affected." (R. 22, 507). The ALJ also concluded that the opinion of state examiner Eric Puestow, M.D. was consistent with her RFC findings, which warranted an "overhead" limitation; Dr. Puestow found plaintiff's reaching was limited to occasional overhead work. (R. 492). Based on these records, the ALJ did not err in concluding that "the medical evidence supports the claimant's primary manipulative limitation to be reaching overhead." (R. 21-22). In addition, there is no evidence in the record that supports further reaching limitations, and an ALJ need only credit those limitations that are supported by evidence in the record. Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995). Hypothetical questions that assume unsupported allegations do not bind the ALJ. Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993).

Specifically as to plaintiff's DOT argument, a job requiring frequent reaching does not necessarily require more than occasional overhead reaching. The VE was aware of plaintiff's limitations on overhead reaching, and he testified both that she could perform the jobs he identified and that his opinion of the jobs open to plaintiff was consistent with the DOT's specifications. In such cases, the VE's testimony does not conflict with the DOT so much as it clarifies how the DOT's broad categorizations apply to this specific case. See Segovia v. Astrue, 226 Fed.Appx. 801, 804, (10th Cir. 2007).[9] Thus, there is substantial evidence that supports the ALJ's limitation only with respect to overhead reaching, and the ALJ did not err in limiting plaintiff's overhead reaching to occasional; therefore, the ALJ also did not err in accepting the jobs offered by the VE.[10]

---

[9] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

[10] The total number of light jobs the VE determined a person in plaintiff's condition could perform in Oklahoma was 2,150, and the total number of sedentary jobs was 900. (R. 53-54).

However, even were the Court to accept plaintiff's argument regarding the scope of reaching contained in the RFC, the VE testified that there are a significant number of jobs which plaintiff can perform. Plaintiff argues to the contrary and cites <u>Allen v. Barnhart</u>, 357 F.3d 1140, 1144 (10th Cir. 2004) (citing <u>Trimiar v.Sullivan</u>, 966 F.2d 1326, 1330 (10th Cir. 1992)), stating these cases set the minimum number of "significant jobs" to be between 650 and 900. Plaintiff argues the number of jobs found (500 in her argument) is insufficient. First, plaintiff is misinterpreting the VE's response to her counsel's hypothetical. The VE first testified that there are 250 sedentary jobs, which plaintiff can perform, available in Oklahoma and 25,000 in the nation. The VE then testified that there are an additional 500 <u>light</u> jobs, which plaintiff can perform, available in Oklahoma. (R. 55-56). Thus, the VE testified, in response to plaintiff's counsel's hypothetical, that there are 750 jobs available in Oklahoma, not 500. <u>Id.</u> As a result, the cases cited by plaintiff do not support her argument, since the number of jobs available (750) is squarely within the 650-900 job range she advocates. In any event, the Tenth Circuit, in <u>Allen</u>, wrote that "the issue of numerical significance entails many fact-specific considerations requiring individualized evaluation, and most importantly, that the evaluation 'should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation.'" <u>Allen</u>, 357 F.3d at 1144-45, (citing <u>Trimiar</u>, 966 F.2d at 1330); <u>Segovia</u>, 226 Fed.Appx. at 804 ("inappropriate for the federal courts to determine in the first instance whether a particular number of jobs is a significant number.").

For these reasons, plaintiff's argument regarding her reaching limitation and the available number of jobs that she can perform is rejected.

2. The ALJ's Hypothetical

Next, plaintiff argues the hypothetical question posed to the VE was not precise. Plaintiff complains that the ALJ failed to include any limitations regarding her thoracic strain. Specifically, plaintiff argues that although the ALJ found plaintiff's "cervical and lumbar strains" severe, he did not assess the severity of her "consistently diagnosed 'cervicothoracic strain' and related problems with her mid to upper back and trapezius muscle." (Dkt. # 12 at 3). Plaintiff argues the ALJ is required to consider all of a plaintiff's impairments, severe and non-severe, in determining her RFC. Plaintiff cites Stokes v. Astrue, 274 Fed.Appx. 675, 679 (10th Cir. 2008) and Salazar v. Barnhart, 468 F.3d 615, 621 (10th Cir. 2006) (failure to consider all impairments is reversible error.) A review of the entire record reveals that plaintiff was diagnosed with "cervicothoracic strain" twice, once immediately after her auto accident, and again the following month. The definition of cervicothoracic is "of or relating to the neck and thorax."[11] There are no other cervicothoracic diagnoses in the record, and in her RFC explanation, the ALJ detailed plaintiff's inconsistent reports to her physicians regarding her neck pain and improvement. (R. 21). For instance, on at least 14 occasions after plaintiff's last cervicothoracic diagnosis, plaintiff reported that she was either not experiencing any neck pain or that her neck was not a problem. (R. 293, 295, 299, 307, 311, 313, 324, 326, 329, 330, 334, 342, 501, 516). The ALJ specifically stated that she considered all of the evidence, and the evidence does not support plaintiff's alleged neck impairment. (R. 21, 22). Thus, the ALJ's hypothetical is supported by substantial evidence.

---

[11] See http://www.merriam-webster.com/medlineplus/cervicothoracic.

3.  Plaintiff's Alleged Mental Impairment

Finally, plaintiff alleges the ALJ ignored evidence of her anxiety and depression, failing to assign any mental limitations in the hypothetical and/or decisional RFCs.  In so doing, plaintiff alleges the ALJ failed to employ the "special technique" for evaluating mental impairments.  Plaintiff argues "[t]here is no authority requiring that mental health treatment be delivered by a psychiatrist or psychologist."  Fleetwood v. Barnhart, 211 Fed.Appx. 736, 739 (10th Cir. 2007).  Plaintiff also argues the ALJ must consider all documented impairments throughout the process.  Plaintiff notes that her counsel requested a consultative exam at the hearing, but none was performed, and the ALJ failed to complete or have completed a Psychological Review Technique ("PRT") form, claiming this form is necessary to properly form a hypothetical.  Frantz v. Astrue, 509 F.3d 1299, 1303 (10th Cir. 2007).  None of these arguments have sufficient merit to reverse the ALJ's decision or to remand for further proceedings.

As to plaintiff's allegation that the ALJ ignored her mental impairment, the undersigned disagrees.  Plaintiff did not meet her burden of proof regarding the existence of such a limitation at step two.  See Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  Moreover, plaintiff did not allege a mental limitation in her applications, and her attorney did not mention mental limitations at the hearing.  In fact, her attorney specifically stated that her disability claim related solely to her physical condition.  (R. 35).  Consistent with this statement, when requesting a consultative examination, plaintiff did so for physical problems only, not mental impairments.  Additionally, at the end of her hearing, plaintiff testified that she did not have any limitations that she had not discussed.  (R. 50).  She did not discuss any mental limitations.  The ALJ is entitled to rely on a claimant's counsel to present the claimant's case in a way which explores all claims.

Cowan v. Astrue, 552 F.3d 1182, 1188 (10th Cir. 2008); Rutledge v. Apfel, 230 F.3d 1172, 1175 (10th Cir. 2000) (ALJ did not need to point to evidence showing that the claimant could walk, stand, lift, carry, bend, or stoop when the record showed no impairment of these abilities, nor did the ALJ need to investigate these subjects).  Isolated references to plaintiff's medication, which is all that is present here, will not warrant remand when the claimant's attorney told the ALJ that the case was fully explored, and the attorney did not bring plaintiff's mental allegations to the attention of the ALJ, nor was the claimed mental disorder mentioned in plaintiff's application documents.  See Maes v. Astrue, 522 F.3d 1093, 1097 (10th Cir. 2008).  Simply put, the ALJ's duty to develop the record is "not unqualified."  Wall v. Astrue, 561 F.3d 1048, 1063 (10th Cir. 2009).  The ALJ has a duty to develop the record consistent with the issues raised.  Id.  Here, plaintiff's counsel did not identify any mental limitations, and this issue was not substantial on the face of the evidence before the ALJ.  See id.  The claimant has the burden to make sure that the record contains evidence sufficient to suggest a reasonable possibility that a severe impairment exists.  Id.  Plaintiff did not carry this burden in relation to a mental condition.

**Medical Source Evidence**

Plaintiff alleges the ALJ "engaged in improper picking and choosing only portions of the medical evidence that support her decision, while ignoring or minimizing portions favorable to Claimant."  (Dkt. # 12 at 5).  Plaintiff claims the ALJ gave great weight to Dr. Puestow's opinion, yet did not reconcile the apparent discrepancy between the decisional RFC of occasional reaching overhead bilaterally with Dr. Puestow's limitation on reaching in "all directions (including overhead)."  Plaintiff also argues that Dr. Puestow "developed his opinion without reviewing Exhibits 5F through 13F, approximately 73 pages of relevant medical records."  (Dkt. # 12 at 5).

As to the first argument, the ALJ addressed Dr. Puestow's opinion as follows:

> After careful consideration of the objective evidence of record, the testimony at the hearing, and the claimant's activities of daily living, I give great weight to the opinion of the medical consultant, Eric Puestow, M.D. of the State Disability Determination Services (DDS), received at the initial level of this case. I conclude that the medical evidence and his opinion are consistent with the residual functional capacity noted above. Further, Dr. Puestow, who is an expert in assessing the physical limitations that reasonably flow from a medical condition, has concluded the claimant can reasonably be expected to perform at less than the light exertional level with the limitations I find above. I give less weight to the opinion of DDS medical consultant Donald Morford, M.D. received at the reconsideration level of this case, because his opinion does not include the limitation of only occasional overhead reaching bilaterally, which I find is supported by the medical evidence of record discussed above.

(R. 23). Dr. Puestow explained plaintiff's reaching limitation on the RFC form by stating "[b]oth occasional OHW." (R. 492). OHW means overhead work, which the ALJ obviously accepted as a limitation on overhead use of plaintiff's arms. (R. 23).

As to Exhibits 5F through 13F, plaintiff is correct that Dr. Puestow did not review all of these records. However, plaintiff omits from her argument the fact that the ALJ rejected Dr. Morford's opinion, who did review the majority of these records and found that plaintiff had no reaching limitations at all. Id. As importantly, the VE testified that there were jobs which plaintiff could perform even if her RFC included a limitation on reaching in all directions. This issue was addressed in more detail above and renders this objection moot, even were the Court to accept plaintiff's argument.

Plaintiff next complains that the ALJ did not properly weigh the treating physician opinion of Dr. Krause and failed to "name the impairment that Dr. Alvarez assessed that is allegedly outside his expertise." (Dkt. # 12 at 5-7). The ALJ properly weighed both Dr. Krause and Dr. Alvarez' opinions and properly assigned their weight according to the medical evidence of record, including their own treatment notes. She noted of Dr. Krause's opinion:

On September 21, 2007, Dr. Krause issued a physical medical source statement finding a capacity to perform work differing from my finding of the claimant's residual functional capacity in some respects discussed below.  She restricted the claimant's lifting to fifteen pounds occasionally, less than ten pounds frequently.  Dr. Krause indicated the claimant could only stand for fifteen minutes at a time before she needed to sit, and that the claimant must periodically alternate sitting and standing to relieve pain or discomfort.  She found the claimant's pushing/pulling limited in the upper extremities.  She indicated that the claimant's handling, fingering, and feeling were frequently affected by her impairment because she is unable to use her arms away from her body, and that her reaching was occasionally affected.  However, immediately after finding these manipulative limitations, Dr. Krause indicated the claimant can frequently handle, finger, and feel.  This is an inconsistency, and I find that the medical evidence supports the claimant's primary manipulative limitation to be reaching overhead.

…

Based on the objective medical evidence that establishes the severity of the claimant's impairments, and the following other factors, I give some weight to Dr. Krause's treating source opinion, to the extent it is consistent with my finding of the claimant's residual functional capacity indicated above.

(R. 22).  As to Dr. Alvarez' opinion, the ALJ explained exactly why she discounted his opinion:

Dr. Alvarez wrote a neurological maximum medical improvement report dated October 16, 2006.  His assessment was that the claimant's posttraumatic headaches and cervicothoracic ligamentous strain had reached maximum medical improvement.  The claimant's lumbosacral ligamentous strain seemed to have permanently aggravated due to her motor vehicle accident on January 10, 2006.  Based on magnetic resonance imaging (MRI) results and the claimant's past history of ongoing lower back pain, Dr. Alvarez indicated the claimant would likely be predisposed to increased symptoms.  (Exhibit IF/19-20).  However, to the extent he assessed the condition of the claimant's spine Dr. Alvarez's medical opinion is given little weight, because he is a neurologist, and his opinion appears to rest, at least in part, on the assessment of an impairment that is outside the area of his expertise.

(R. 20).  The ALJ recognized Dr. Krause as plaintiff's treating physician, and noted Dr. Krause's treating source opinion was inconsistent from her own treatment records.  The ALJ also noted Dr. Alvarez' opinion with regard to plaintiff's spine was outside his area of expertise, while giving the areas of his Maximum Medical Improvement opinion the deserved weight in

accordance with the objective evidence he relied on. Thus, the undersigned finds that the ALJ's assignment of weight to the medical source opinions is supported by substantial evidence.

**Credibility Assessment**

Plaintiff's final argument is that the ALJ failed to perform a proper credibility analysis. This argument is unfounded. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, [f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir.1995) (quotation and citation omitted). The ALJ must "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible." Id. The ALJ listed inconsistencies in plaintiff's reported pain levels to various physicians, and the ALJ listed inconsistency between plaintiff's testimony that she had not attempted to complete her GED and her various reports to Dr. Krause, and others, that she was working on her GED. (R. 22). The ALJ also noted the inconsistency of her testimony regarding "pacing" constantly with her assertion that she is only able to stand fifteen minutes at a time. Id. The ALJ noted plaintiff's testimony that she was unable to sit and look down for more than ten to fifteen minutes at a time and contrasted it with her numerous reports to treating physicians that she was going to school to obtain her GED. The ALJ further noted claimant's sporadic work history from 1995 through 2004, and her continued unemployment for the year before the auto accident giving rise to the current applications for disability. (R. 23). In light of the deference afforded the ALJ on the issue of credibility and the fact that the ALJ did cite to specific evidence which could fairly be interpreted as creating a credibility issue, the Court finds the ALJ's credibility determination to be supported by substantial evidence.

## **Conclusion**

For the above stated reasons, this Court AFFIRMS the Commissioner's denial of Disability Insurance Benefits.

SO ORDERED this 15th day of February, 2012.

T. Lane Wilson
United States Magistrate Judge